# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
### TAMPA DIVISION

KEVIN MCBRIDE,

      Plaintiff,

v.                                                    Case No: 8:21-cv-546-CEH-AEP

JOHN W. GUZINA, *et al.*,

      Defendants.

_____/

# ORDER

This matter comes before the Court on Defendant Chad Chronister's Motion to Dismiss (Doc. 73); Defendants Ashley Hodge, Jeffrey S. Marshall, Monique M. Scott, and Laura E. Ward's Motion to Dismiss (Doc. 74); Defendant Ray Roa's Motion to Dismiss (Doc. 75); Defendant Douglas Messina's Motion to Dismiss (Doc. 76); Defendants Michael K. Campani, City of Tampa, John W. Guzina, Susan C. Harmison, David J. Hazelzet, Martha A. Murillo, and Robin S. Sarrasin's Motion to Dismiss (Doc. 77); Tampa General Hospital's Motion to Dismiss (Doc. 78); Defendant Lightning Hockey, LP's Motion to Dismiss (Doc. 91), and Daryl Niles' Re-Filed Motion to Dismiss (Doc. 102). Plaintiff, Kevin McBride, filed responses in opposition. (Docs. 86, 79, 80, 81, 84, 92, 93, 105). In the motions, Defendants state that Plaintiff's Second Amended Complaint should be dismissed as a shotgun pleading. Additionally, Defendants argue several other bases for dismissal, including failure to state a cause of action, immunity protections, improper service, and *Heck v.*

*Humphrey*[1] preclusion. The Court, having considered the motions and being fully advised in the premises will grant Defendants' Motions to Dismiss and give Plaintiff one final opportunity to amend.

## I.   BACKGROUND

### a. Factual Allegations[2]

Plaintiff, Kevin McBride ("Plaintiff" or "McBride"), a 53-year-old former business owner, who is proceeding *pro se*, filed his Second Amended Complaint (Doc. 69) on August 16, 2021. The events giving rise to the Plaintiff's claims are as follows.

#### i.   Amalie Arena

On March 3, 2019, Plaintiff attended a PINK concert at Amalie Arena. (Doc. 69 ¶ 38). Shortly after taking his seat around 9:00 p.m., an "unruly fan" started hitting Plaintiff with her purse. *Id.* ¶¶ 40–41. In response, Plaintiff left his seat and attempted to get reseated elsewhere, but he eventually returned to his assigned seat after realizing the process would take too long. *Id.* ¶ 42. From there the behavior of the unruly fan escalated, and Plaintiff again went to seek help—only this time, Officer David J. Hazelzet ("Officer Hazelzet"), a police officer for the Tampa Police Department ("TPD"), approached and attacked Plaintiff. *Id.* ¶¶ 46–47. After the attack, Officer

---

[1] *Heck v. Humphrey*, 512 U.S. 477 (1994). "*Heck* generally bars § 1983 claims that would necessarily imply the unlawfulness of a conviction or sentence that had not previously been invalidated." *Topa v. Melendez*, 739 F. App'x 516, 517 (11th Cir. 2018) (citing *Heck*, 512 U.S. at 486–87).

[2] The statement of facts is derived from the Second Amended Complaint (Doc. 69), the allegations of which the Court must accept as true in ruling on the instant motions to dismiss. *Linder v. Portocarrero*, 963 F.2d 332, 334 (11th Cir. 1992); *Quality Foods de Centro Am., S.A. v. Latin Am. Agribusiness Dev. Corp.* S.A., 711 F.2d 989, 994 (11th Cir. 1983).

Hazelzet—together with TPD Officer Michael K. Campani ("Officer Campani")—
handcuffed the Plaintiff and walked him to the back of the arena. *Id.* ¶ 50. Defendant
Daryl Niles ("Niles"), former head of security for Amalie Arena, was present and
"took command of the situation." *Id.* ¶¶ 68, 69, 70. Plaintiff alleges he was framed by
TPD with the help of Niles. *Id.* ¶ 78.

Around 9:15 p.m., Officers Hazelzet and Campani placed Plaintiff in the
Amalie Arena holding cell after taking his personal items. *Id.* ¶ 73. Two additional
TPD officers, Robin S. Sarrasin (Officer Sarrasin") and Baird (non-defendant), took
Plaintiff to Tampa General Hospital around 9:30 p.m., despite Plaintiff's repeated
refusal of medical treatment. *Id.* ¶ 83.

     ii.    Tampa General Hospital

At Tampa General Hospital ("TGH"), Officer Sarrasin physically and verbally
assaulted Plaintiff. *Id.* ¶ 95. Officer Sarrasin remained in the emergency room and
attempted to force the doctor to "Baker Act" the Plaintiff. *Id.* ¶ 96. TGH was
indifferent to Plaintiff's allegations of police misconduct and, despite Plaintiff's refusal
of medical treatment, he was billed $1,904.00 for his time at TGH. *Id.* ¶ 103.

     iii.    Hillsborough County Jail

Around 10:15 p.m., Plaintiff went through the intake process at Hillsborough
County Jail ("Jail"). There, he was labelled "combative" and was placed into a holding
tank. *Id.* ¶ 123. The Jail "slow processed" the Plaintiff after midnight, so he had to
remain in the "freezing" facility and was not allowed to sleep until 4:00 a.m. *Id.* ¶ 125.

The following morning, on March 4, 2019, the Plaintiff posted $4,000 bond and was released from the Jail in the late afternoon with two charges: felony battery and felony resisting arrest. *Id.* ¶¶ 149, 150–151. Upon his release, Plaintiff noticed that several of his personal items were missing. *Id.* ¶ 127.

      *iv.*    *Creative Loafing*

On March 5, 2019, Defendant Ray Roa ("Roa") of *Creative Loafing* published an alleged defamatory media report regarding Plaintiff's arrest. *Id.* ¶ 159. Plaintiff alleges that Roa released this false report without his consent and in collaboration with the TPD to sway public opinion against him. *Id.* ¶ 160–162. Further, Roa posted medical information that could "only have been obtained" from one of the co-defendants in this case. *Id.* ¶ 163.

In addition to the defamatory article, Roa and his associates allegedly stalked Plaintiff's social media pages, which resulted in judicial bias against the Plaintiff by using his own words against him. *Id.* ¶ 167–169. Plaintiff alleges that due in part to the predominantly female and LGBT fanbase at the PINK concert, Roa's public labelling of Plaintiff as a "homophobe" and "sexist" may have prevented any potential witnesses from coming forward with video of the assault. *Id.* ¶ 171–173.

      *v.*    State Court Proceedings

On March 14, 2019, Assistant State Attorney Monique Scott ("Scott") initiated prosecution of Plaintiff's criminal case. *Id.* ¶ 202. Plaintiff asserts a multitude of allegations against Scott for prosecutorial misconduct, including an alleged motivation to convict Plaintiff regardless of his innocence, a failure to investigate, manufacturing

witnesses, falsifying legal documents, and suborning perjury. *Id.* ¶¶ 202–219. These allegations include a lack of due diligence (*id.* ¶ 202); a bias or motivation against Plaintiff causing Scott to rely on Plaintiff's "media persona" rather than evidence (*id.* ¶ 203–204); the manufacturing of witnesses like Amalie Arena security guard—Defendant Douglas Messina—to create probable cause (*id.* ¶ 206); the addition of a fabricated charge (*id.* ¶ 209); and intentional violations of constitutional and civil rights (*id.* ¶¶ 203, 214).

On March 22, 2019, Plaintiff contacted public defender Ashley Hodge ("Hodge"). *Id.* ¶ 249. Hodge allegedly showed bias toward Plaintiff, presumably from researching Plaintiff's character on social media. *Id.* ¶ 254. Hodge was consistently rude in her communications to Plaintiff and informed him that "this case is going to trial, and it will be your word against the police." *Id.* ¶¶ 252–253. Plaintiff's arraignment was scheduled on April 4, 2019. *Id.* ¶ 257. There, public defender Keierica Baker stood in for Hodge and ignored Plaintiff's requests for a motion to dismiss. *Id.* ¶¶ 258–260. Defendant Judge Laura E. Ward ("Judge Ward") presided over the criminal case, and at his arraignment she "cut off" Plaintiff and "shout[ed] down to the Plaintiff in a tyrannical type of way." *Id.* ¶ 262.

On April 8, 2019, Plaintiff received discovery from the government in his criminal case. *Id.* ¶ 266. This discovery "changed to the benefit of the [assistant state attorney]," and included unknown officers, new statements, and new photos. *Id.* ¶¶

266–273. On May 16, 2019, Plaintiff was ordered to take a mental exam by Judge Ward against his wishes. *Id.* ¶ 313.

On May 20, 2019, four officers from the TPD visited the Plaintiff at his home without a warrant. *Id.* ¶ 327. The officers forced Plaintiff to remove social media posts about Defendant John W. Guzina ("Guzina"), the head of the crime division at TPD. *Id.* ¶ 331. Plaintiff requested to get his missing personal items back, but to no avail. *Id.* ¶¶ 330, 332.

On June 17, 2019, Plaintiff completed the court-ordered medical exam, receiving a score of 96 out of 100. *Id.* ¶ 356. Days later, the assistant state attorney ("ASA") moved to modify Plaintiff's bond—this motion sought home confinement, a travel ban, and forfeiture of all weapons. *Id.* ¶ 359. Defendant Judge Ward granted the motion—allegedly based on personal animus and racial discrimination. *Id.* ¶¶ 361, 363. Hearings before Judge Ward were conducted over the next two days regarding requiring Plaintiff to wear an ankle monitor and limiting Plaintiff's travel. *Id.* ¶¶ 371, 373.

vi.   Plaintiff's Arrest

On July 1, 2019, Plaintiff left for Washington D.C. when an ASA investigator left a notice at his home for a court date the next day. *Id.* ¶ 408 Nobody informed Plaintiff of this date, including his attorneys. *Id.* ¶ 409. As a result, Plaintiff missed the July 2 court date, and the court entered an order for failure to appear, putting a warrant out for his arrest. *Id.* ¶ 412.

6

On July 12, 2019, U.S. Marshals arrested Plaintiff and put him in the Arlington County jail for three months. *Id.* ¶ 415. During his time there, he received no contact from his attorneys. *Id.* ¶ 415. In the meantime, Defendant Roa continued to publish articles about Plaintiff. *Id.* ¶¶ 417–421. Plaintiff was picked up in Arlington on September 22 and was again processed at the Hillsborough County Jail on September 27. *Id.* ¶¶ 455, 457. At a September 29, 2019 bond violation hearing, Defendant Judge Ward allegedly conspired with Judge Elizabeth Rice to hold Plaintiff with no bond. *Id.* ¶ 458.

On October 5, 2019, Judge Ward canceled Plaintiff's court hearing. *Id.* ¶ 470. The night before this anticipated court date, Plaintiff asked a Jail guard for a razor to shave, presumably unaware of the cancellation. *Id.* ¶¶ 475, 476. As a result of this misunderstanding, Plaintiff was forced to take another mental exam, and he was subsequently transferred to Falkenburg Jail. *Id.* ¶¶ 477–482. There, he was subjected to the inhumane jail conditions of solitary confinement for a week. *Id.* ¶¶ 483–484. In subsequent attempts to obtain representation, the Jail allegedly prevented Plaintiff from contacting attorneys or obtaining evidence to properly prepare his case for trial. *Id.* ¶¶ 493, 495, 501, 502.

Plaintiff alleges that due to the fraud and coercion, he was forced by Defendant Judge Ward and his public defenders to accept a plea offer on December 16, 2019 "to get out of this outrageous discriminatory trap." *Id.* ¶ 527. Shortly thereafter, Plaintiff filed for an appeal and withdrawal of his plea which were denied without opinions. *Id.*

¶¶ 530–532. Plaintiff has now "completed all the terms and conditions of his probation" but retains his criminal record in the State of Florida. *Id.* ¶ 533.

### b. Plaintiff's Claims and Defendants' Motions

In his Second Amended Complaint, Plaintiff asserts state and federal causes of action in 34 Counts against seventeen Defendants. As alleged by Plaintiff, the claims asserted include negligent and inadequate security (Count 1); premises liability (Count 1); assault and battery (Counts 2 and 3); illegal search and seizure (Counts 4 and 25); facilitation of police misconduct (Count 5); unlawful detention (Count 6); racial discrimination (Count 7); conspiracy to violate civil rights (Counts 8); conspiracy to interfere with civil rights (Counts 9, 12, and 13); false arrest and imprisonment (Count 10); obstruction of justice and defamation (Count 11); charge piling (Count 14); vindictive prosecution (Count 15); malicious prosecution (Count 16); failure to intervene (Count 17); conspiracy to suppress evidence (Counts 18 and 32); violation of Florida's False Claims Act (Count 19); Sixth Amendment violations (Count 20); police harassment (Count 21); retaliation for exercising freedom of speech (Counts 22, 23 and 28); Second Amendment violation of right to bear arms (Count 24); violation of the right to free travel (Count 26); cruel and unusual punishment (Counts 27, 29, 30); conspiracy to false arrest and imprisonment (Count 31); conspiracy to a false conviction (Count 33); and gender, societal and political discrimination (Count 34).

Defendants move to dismiss the Second Amended Complaint arguing the complaint is a shotgun pleading, service of process was improper, Plaintiff fails to state a claim, certain Defendants are immune from suit, and certain claims are time-barred.

The Court agrees that Plaintiff's Second Amended Complaint is due to be dismissed as a shotgun pleading. The Plaintiff will be given one final opportunity to amend. Because the Court finds certain Defendants enjoy immunity and certain claims are due to be dismissed with prejudice, the Court addresses the merits of the motions to dismiss so that Plaintiff, in repleading, will know which claims are subject to dismissal with prejudice and may not be repleaded.

## II.    LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a pleading must include a "short and plain statement of the claim showing that the pleader is entitled to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 677-78 (2009) (quoting Fed. R. Civ. P. 8(a)(2)). Labels, conclusions and formulaic recitations of the elements of a cause of action are not sufficient. *Id*. (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Furthermore, mere naked assertions are not sufficient. *Id*. A complaint must contain sufficient factual matter, which, if accepted as true, would "state a claim to relief that is plausible on its face." *Id*. (quoting *Twombly*, 550 U.S. at 570). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. (citation omitted). The court, however, is not bound to accept as true a legal conclusion stated as a "factual allegation" in the complaint. *Id*.

## III.    DISCUSSION

### A.    Shotgun Pleading

The Court previously dismissed Plaintiff's Amended Complaint as a shotgun pleading. Doc. 65. As the Court explained, the most common type of shotgun pleading is a complaint containing multiple counts where each count adopts the allegations of all preceding counts. *Id.* at 4 (citing *Weiland v. Palm Beach Cnty Sheriff's Ofc.,* 792 F. 3d 1313, 1322 (11th Cir. 2015). Other examples of shotgun pleadings include a complaint that asserts multiple claims against multiple defendants without specifying which defendant is responsible for which acts or omissions and a complaint that fails to separate into a different count each cause of action. *Weiland*, 792 F.3d at 1322–23. Plaintiff's Second Amended Complaint includes all these pleading pitfalls.

The first numbered sentence of each count incorporates all preceding paragraphs, *see, e.g.,* Doc. 69 ¶¶ 54, 61, 86, 104, 111, 117, as opposed to incorporating only the paragraphs of the general allegations or certain identified paragraphs that are relevant to that particular count. This results in a classic shotgun pleading in which each successive count includes all prior counts with the final count being a combination of the entire complaint.

Plaintiff's Second Amended Complaint also combines multiple causes of action in one count such as claims for negligent security, negligence, and premises liability in a single count (Count 1). While Plaintiff alleges assault and battery in Counts 2 and 3, he combines the counts together although the elements are different for each. Such pleading errors fail to give Defendants notice of the claims against them and the grounds upon which each claim rests. Plaintiff sues multiple Defendants in the same count but fails to identify which Defendant is responsible for which act or omission.

And some of Plaintiff's claims are repetitive, asserting the same cause of action against the same defendant in multiple counts. *See, e.g.,* Doc. 69 at 78 and 82. Such repetitive pleading is a waste of judicial resources.

In addition to being a shotgun pleading, Plaintiff's Second Amended Complaint is still a rambling and incoherent pleading that violates the Federal Rules of Civil Procedure's requirements of a short and plain statement showing that he is entitled to relief. *See* Fed. R. Civ. P. 8(a)(2). Plaintiff has been given multiple opportunities to plead his claims. He is cautioned that failure to cure the pleading deficiencies going forward will result in dismissal of this action with prejudice.[3]

## B.    Section 1985(3) Conspiracy Civil Rights Claims Due to be Dismissed

Plaintiff asserts claims pursuant to 42 U.S.C. § 1985(3) in Counts 8, 9, 12, 13, 15, 18, 20, 23–29, 31–34. To state a claim against a Section 1985(3) defendant, a plaintiff must allege the defendant "(1) conspired . . . (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws, (3) taken or caused an action to be taken in furtherance of the conspiracy's object, and (4) injured an individual's person or property or deprived her of exercising any right or privilege of a United States citizen." *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021) (citing *Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971)). "[U]nder section 1985(3) the

---

[3] To the extent Plaintiff intends to continue to represent himself, he should familiarize himself with both the Federal Rules of Civil Procedure and the Local Rules for the Middle District of Florida, that can be found on the court's website at https://www.flmd.uscourts.gov/litigants.

language requiring an intent to deprive of equal protection means there must be some racial, or perhaps otherwise class-based individually discriminatory claims behind the conspirators' action." *Chavis v. Clayton Cty. Sch. Dist.*, 300 F.3d 1288, 1292 (11th Cir. 2002) (citing *Griffin*, 403 U.S. at 102). "That animus standard requires that the defendant proceeded on his course of conduct 'because of, not merely in spite of, its adverse effects upon an identifiable group.'" *Dean v. Warren*, 12 F.4th 1248, 1255 (11th Cir. 2021) (citing *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 271–72 (1993)). The Supreme Court has explained that the animus requirement is comprised of two analytically distinct inquiries: "(1) whether there is a 'qualifying class' and (2) whether the defendant was motivated by discriminatory animus against the class." *Dean*, 12 F.4th at 1258 (citing *Bray*, 506 U.S. at 269).

Review of the Second Amended Complaint reveals that Plaintiff's allegations fall far short of stating a claim under 42 U.S.C. § 1985(3).[4] Plaintiff fails to allege any qualifying race or class and further fails to allege Defendants were motivated by a discriminatory animus toward the class. Rather, Plaintiff alleges Defendants' motives

---

[4] Plaintiff makes a vague reference to "hatred laced comments," but goes on to give an example of such comments to include, "That's what you get for going to a PINK concert." Doc. 69 ¶ 95. Nothing about this comment reflects a race or class-based animus. Without any factual detail, Plaintiff repeatedly labels this case as involving a hate crime, which he explains Defendants hate him for "reverse sexism, political affiliation, and societal bias." *Id.* ¶ 559. While Count 7, brought under 42 U.S.C. § 1983, is titled a claim for racial discrimination, Plaintiff alleges no facts to support his claim that he has been discriminated against due to his race. Despite Plaintiff's allegations of racial profiling and racial discriminatory intent, he fails to allege he is a member of a minority or, for that matter, allege any race-related fact or any facts demonstrating his race was in any way causally connected to the incidents complained of.

for their conduct are "money and politics." Doc. 69 ¶ 10. Financial motivation does not satisfy the discriminatory animus component of a § 1985(3) action. *See Dean*, 12 F.4th at 1258 (noting "the statute's legislative history suggest[s] that Congress did not intend for it to extend to 'conspiracies motivated by economic or commercial animus' and that such an expansive construction of § 1985(3) was 'not compelled' by its plain language") (citations omitted)).

The Eleventh Circuit in *Dean* recently rejected a plaintiffs' political class-based theory of § 1985(3) liability on facts much more specific than are present here. In *Dean*, the KSU cheerleader plaintiffs claim the Sheriff undertook the conspiracy to prevent them from exercising their First Amendment rights by kneeling during the national anthem. *Id.* at 1263. Without deciding whether political classes can ever serve as a basis for a § 1985(3) claim, the *Dean* court found no § 1985(3) liability toward the plaintiff political class of members protesting police brutality against African Americans. In so ruling, the court held that a plaintiff may not ground his civil rights conspiracy claim on classes defined by the conduct the defendants oppose. *Id.* at 1264 ("[w]hatever may be the precise meaning of a 'class' for purposes of . . . extension of § 1985(3) beyond race, the term unquestionably connotes something more than a group of individuals who share a desire to engage in conduct that the § 1985(3) defendant disfavors") (citations omitted). Other than Plaintiff's speculative, general comments of political bias and discrimination, Plaintiff makes no specific factual allegations regarding his political affiliation or membership in a political class, how he has been discriminated against because of it, or the causal connection. At most, Plaintiff alleges

he holds different political or gender beliefs than Defendants. Moreover, Plaintiff's vague, conclusory allegations fail to allege the existence of any joint agreement among the Defendants to conspire against him. *See Fullman v. Graddick*, 739 F.2d 553, 556 (11th Cir. 1984) ("In civil rights and conspiracy actions, courts have recognized that more than mere conclusory notice pleading is required."). Accordingly, Counts 8, 9, 12, 13, 15, 18, 20, 23–29, 31–34, which are brought under § 1985(3), are due to be dismissed. As this is Plaintiff's third attempt at pleading and he has yet to allege any fact remotely suggesting a race or class-based animus to support a claim under § 1985(3), dismissal of these Counts, to the extent they are brought under 42 U.S.C. § 1985(3), will be with prejudice. On the facts alleged here, amendment would be futile.

## C.    The Sheriff's Motion to Dismiss (Doc. 73)

Throughout his Second Amended Complaint, Plaintiff names Hillsborough County Sheriff's Office ("HCSO"); Chad Chronister, as Sheriff of HCSO ("Sheriff"); and the HCSO Jail interchangeably. He brings claims against the Sheriff and/or the HCSO in Counts 8 (conspiracy to violate civil rights), 10 (false arrest and imprisonment), 17 (failure to intervene), 28 (retaliation from freedom of speech), 30 (obstruction of justice cruel and unusual punishment), 31 (conspiracy to false arrest and imprisonment), and 33 (conspiracy to a false conviction). To bring a claim against the HCSO, the proper party to name is Chad Chronister, in his official capacity as the Sheriff of HCSO. *See Faulkner v. Monroe Cty. Sheriff's Dep't*, 523 F. App'x 696, 701 (11th Cir. 2013) (noting that, in Florida, a sheriff's office is not a legal entity with the

capacity to be sued). Thus, any claim against the HCSO or the HCSO Jail may be brought only against the Sheriff in his official capacity.

The Sheriff moves to dismiss all claims against him. Doc. 73. The Sheriff contends he has never been properly served, the Second Amended Complaint is a shotgun pleading, *Heck v. Humphrey* bars some or all of Plaintiff's claims, and Plaintiff fails to state a cause of action against the Sheriff.[5] *Id.*

On the issue of service, the Sheriff argues the complaint served on him is not contained in the court file and is a different version than the amended complaint filed by Plaintiff. Doc. 73 at 2. Plaintiff responds that service was proper, he has a valid waiver from the Sheriff, and in any event, the Sheriff has now responded to the complaint which was emailed to the Sheriff and accepted by him. Doc. 86 at 3–4.

"[A] plaintiff bears the ultimate burden of proving valid service of process." *Friedman v. Schiano*, 777 F. App'x 324, 331 (11th Cir.), *cert. denied*, 140 S. Ct. 575 (2019). Here, Plaintiff fails to do so. "Service of process is a jurisdictional requirement: a court lacks jurisdiction over the person of a defendant when the defendant has not been served." *Pardazi v. Cullman Med. Ctr.*, 896 F.2d 1313, 1317 (11th Cir. 1990). Accordingly, if the Court finds service to be improper, the Court must either allow additional time for proper service if appropriate or dismiss the claims against the

---

[5] As noted above, Plaintiff's Second Amended Complaint is a shotgun pleading and is subject to dismissal. Additionally, Plaintiff's claim in Count 8 under § 1985(3) is due to be dismissed for the reasons stated above. Regarding the Sheriff's argument that Counts 10, 31 and 33 are barred by *Heck v. Humphrey*, the Court need not reach the applicability of *Heck* to the claims here, as is discussed further below.

improperly served defendants without prejudice. Fed. R. Civ. P. 4(m); *Horenkamp v. Van Winkle & Co.*, Inc., 402 F.3d 1129, 1132 (11th Cir. 2005); *Jackson v. Warden, FCC Coleman-USP*, 259 F. App'x 181, 183 (11th Cir. 2007). The Court cannot, however, reach the merits of the plaintiff's claims against improperly served defendants unless and until those defendants are properly served or service of process is waived. *See* Fed. R. Civ. P. 4(m); *Jackson*, 259 F. App'x at 183.

Plaintiff claims the Sheriff is aware of the suit as evidenced by his motion to dismiss. However, "[a] defendant's actual notice is not sufficient to cure defectively executed service." *Albra v. Advan, Inc.*, 490 F.3d 826, 829 (11th Cir. 2007). Review of the docket reveals no return of service or waiver of service has been filed for the Sheriff, nor has Plaintiff provided such proof with his response. Plaintiff attaches to a prior response an email in which it appears he sent a copy of a complaint to the HCSO via email. Doc. 61-1. Further, the Sheriff has consistently challenged the propriety of service. *See* Docs. 41, 73. Because the Sheriff raised insufficiency of service in its first responsive motion, the Court finds the Sheriff has not waived his defense of improper service. *See* Fed. R. Civ. P. 12(h)(1). Plaintiff fails to demonstrate he has properly effected service on the Sheriff. Service on the Sheriff is quashed, and Plaintiff's claims are due to be dismissed.

To the extent Plaintiff chooses to file a Third Amended Complaint that includes any claim against the Sheriff, Plaintiff must properly serve the Sheriff with the Third Amended Complaint in accordance with Rule 4, Federal Rules of Civil Procedure.

### D.    Hodge, Marshall, Scott, & Judge Ward's Motion to Dismiss (Doc. 74)

16

### 1.    Judge Ward and Judicial Immunity

Plaintiff sues Judge Laura E. Ward ("Judge Ward") in the following Counts: 20, 23, 24–27, 29, 31, 33, and 34. Doc. 69. Plaintiff brings these constitutional claims pursuant to 42 U.S.C. §§ 1982, 1983, 1985(3), and 1986. Invoking judicial immunity, Defendant Judge Ward moves to dismiss all claims asserted against her in the Second Amended Complaint. Doc. 74. The motion is filed collectively with Co-Defendants Scott, Hodge, and Marshall, whose arguments are addressed in a separate section below.

Plaintiff alleges he is suing Judge Ward in her individual capacity. Doc. 69 ¶ 27. "Personal-capacity suits seek to impose personal liability upon a government official for actions [s]he takes under color of state law." *Kentucky v. Graham*, 473 U.S. 159, 165 (1985). Judicial immunity offers absolute immunity, barring personal-capacity claims against judges whose actions are within their judicial capacity and not in the "clear absence of all jurisdiction." *Stevens v. Osuna*, 877 F.3d 1293, 1302 (11th Cir. 2017). This immunity applies even when the judge's actions were erroneous, malicious, or in excess of their authority. *Scott v. Hayes*, 719 F.2d 1562, 1566 (11th Cir. 1983) (quoting *Stump v. Sparkman*, 435 U.S. 349, 356-57 (1978)). To determine whether a judge's act is judicial for the purpose of immunity, the court considers (1) whether the act complained of is a normal judicial function, (2) whether the events involved occurred in open court, (3) whether the controversy centers on a case pending before the judge, and (4) whether the confrontation arises directly and immediately out of a visit to the judge in her judicial capacity. *Id.* at 1565. Then, the court must determine whether the

judge acted in the clear absence of all jurisdiction. *Id.* at 1566. When a judge's actions are within her judicial capacity and not in the clear absence of all jurisdiction, judicial immunity bars such claims. *Id.*

In determining whether to apply judicial immunity for a particular act, the Court looks to "the nature and function of [her] act, not the propriety of the act itself, and consider[s] whether the nature and function of the particular act is judicial." *McCullough v. Finley*, 907 F.3d 1324, 1330–31 (11th Cir. 2018) (citing *Mireles v. Waco*, 502 U.S. 9, 13 (1991)). In a light most favorable to the Plaintiff, the facts as alleged in the Second Amended Complaint support a finding that judicial immunity bars Plaintiff's claims against Judge Ward. Plaintiff alleges Judge Ward shouted down at him from the bench in a "tyrannical way" during his arraignment hearing (Doc. 69 ¶ 262); Judge Ward ordered him to undergo a mental exam despite no history of mental illness (*id.* ¶ 313); he asserts the forced mental exam was due to bias of Judge Ward and hatred of the Plaintiff and to delay the proceedings (*id.* ¶ 320); Judge Ward granted the state's motion in Plaintiff's criminal case imposing bond, forfeiture of weapons, home monitoring, and a travel ban (*id.* ¶¶ 359, 363); Judge Ward "perjured herself from the bench" reading Plaintiff's emails in open court (*id.* ¶ 364); Judge Ward tried to jail Plaintiff if he did not have enough money for an ankle monitor (*id.* ¶ 371); Judge Ward banned Plaintiff from traveling (*id.* ¶ 403); Judge Ward conspired with another judge to hold Plaintiff with no bond (*id.* ¶ 458); and Judge Ward canceled a hearing (*id.* ¶ 470).

The first factor weighs heavily in favor of granting immunity—the facts pertaining to Judge Ward in the Second Amended Complaint, taken as true, all reflect normal judicial functions. Communicating with Plaintiff (Doc. 69 ¶ 262), ordering mental examinations (*id.* ¶ 313), granting motions (*id.* ¶¶ 361, 363), presiding over hearings (*id.* ¶¶ 371, 373), denying bond (*id.* ¶ 458), and cancelling hearings (*id.* ¶ 470) are all unequivocally normal judicial functions. That Plaintiff disagrees with the propriety of Judge Ward's actions is of no consequence, so long as "the nature and function of the particular act is judicial," which it is here. *McCullough*, 907 F.3d at 1331.

The remaining three factors also weigh in favor of granting judicial immunity. Nowhere in the Second Amended Complaint does Plaintiff allege that the acts in question occurred outside of the judge's chambers or the court setting. Rather, the factual assertions indicate that all of Judge Ward's alleged acts arose in connection with Plaintiff's criminal case, which was then pending before her.

Because Defendant Judge Ward had "jurisdiction over the subject matter before h[er]," she is protected by absolute judicial immunity for the claims asserted here. *Stump*, 435 U.S. at 356. Accordingly, all claims against Judge Ward are dismissed with prejudice.

## 2. Scott and Prosecutorial Immunity

Plaintiff sues Defendant former Assistant State Attorney Monique M. Scott ("Scott") in the following Counts: 8–15, 18, 20, 23–27, 29, and 31–34. (Doc. 69). Scott

is a former ASA for the Thirteenth Judicial Circuit and is currently a state court judge in Plant City.

Defendant Scott moves to dismiss all claims against and argues that prosecutorial immunity bars any claims against her for her conduct as a prosecutor for the Thirteenth Judicial Circuit. Doc. 74 at 9. "A prosecutor is entitled to absolute immunity for all actions [s]he takes while performing h[er] function as an advocate for the government." *Rivera v. Leal*, 359 F.3d 1350, 1353 (11th Cir. 2004) (citing *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993)). This function consists of the initiation and pursuit of a criminal prosecution and most appearances before the court—including the examination of witnesses and the presentation of evidence. *Id.* (citing *Imbler v. Pachtman*, 424 U.S. 409, 431 (1976); *Burns v. Reed*, 500 U.S. 478, 492 (1991)). In other words, a prosecutor is shielded from liability for actions that are "intimately associated with the judicial phase of the criminal process." *Mikko v. City of Atlanta, Georgia*, 857 F.3d 1136, 1142 (11th Cir. 2017) (quoting *Imbler,* 424 U.S. at 430–31).

Plaintiff responds that Defendants must be responsible for their actions and there should be no immunity protection for constitutional violations. Doc. 79. Regarding Scott, Plaintiff argues that she acted as a law enforcement officer and stepped out of her role as prosecutor. While it is true that a prosecutor is not entitled to absolute immunity when functioning as an investigator or a complaining witness, *see Rivera*, 359 F.3d at 1353, the allegations here do not support that Scott was acting as an investigator or complaining witness. A prosecutor functions as an investigator

when "searching for clues and corroboration that might give him probable cause to recommend that a suspect be arrested." *Buckley*, 509 U.S. at 273.

The facts alleged in the Second Amended Complaint do not plausibly show that Scott was functioning as an investigator or complaining witness. Rather the allegations relate to her conduct while serving as an assistant state attorney participating in the judicial process and prosecuting Defendant's criminal case. Count 13 sues Scott for conspiracy to interfere with civil rights, alleging she prosecuted the case against Plaintiff based on her own personal vendetta. Doc. 69 at 41–42. In Count 14, Plaintiff sues Scott for "charge piling" and alleges she allowed perjured testimony and fabricated charges against him. *Id.* at 42–44. Count 15 alleges Scott vindictively prosecuted Plaintiff by fabricating a victim and witness, adding charges against him, and changing discovery responses. *Id.* at 44–49. Count 17 alleges conspiracy to suppress evidence, claiming Defendant Scott failed to properly investigate and to turn over evidence favorable to Plaintiff. *Id.* at 53–54. In Counts 23–27 and 29, Plaintiff asserts claims against Scott under 42 U.S.C. § 1985, for alleged retaliation of free speech rights (Doc. 69 at 68–69); violation of Plaintiff's Second Amendment Right to bear arms (*id.* at 69–70); illegal search and seizure order in violation of Fourth and Sixth Amendments (*id.* at 70–72); restriction of his right to travel in violation of the Fifth and Ninth Amendment (*id.* at 72–77); cruel and unusual punishment in violation of the Eighth Amendment and conspiracy (*id.* at 78–79); cruel and unusual punishment in violation of the Eighth Amendment and conspiracy (*id.* at 82–106). Counts 32 and 34 assert claims under § 1985(3) for conspiracy to suppress evidence

and "gender, societal and political discrimination." As discussed above, all claims brought under § 1985(3) are due to be dismissed as Plaintiff fails to allege any type of racial or class-based animus. *See Chavis*, 300 F.3d at 1292.

Scott is entitled to prosecutorial immunity. Plaintiff's factual allegations against Scott arise from her role as a prosecutor. In a light favorable to Plaintiff, he alleges Scott falsified documents, swayed the court to grant a motion, conspired to revoke Plaintiff's bond on false pretenses, ordered police to Plaintiff's residence, argued to modify Plaintiff's bond, manufactured witnesses, and fabricated charges. (Doc. 69 ¶¶ 202–219. 365, 370, 395). Submitting documents to the court, arguing motions, attending hearings, bringing charges, and compiling witnesses are all functions that are "intimately associated with the judicial phase of the criminal process." *Mikko* 857 F.3d at 1142. Further, even if Defendant Scott knowingly fabricated witnesses or falsified documents, these extreme allegations remain protected by absolute prosecutorial immunity insofar as they were not the result of Scott functioning as an investigator. *See Rowe v. City of Fort Lauderdale*, 279 F.3d 1271, 1279–80 (11th Cir. 2002) (holding immunity extends so far as to protect prosecutors who "knowingly proffered perjured testimony and fabricated exhibits at trial"). Because Defendant Scott's actions as alleged in the Second Amended Complaint were performed in her role as prosecutor, absolute prosecutorial immunity protects Scott from liability here, and all claims against her are due to be dismissed with prejudice.

### 3.     Hodge and Marshall

Plaintiff sues attorney Ashley Hodge ("Hodge"), a former Public Defender for the Thirteenth Judicial Circuit, who performed duties as a criminal defense attorney on Plaintiff's behalf. Doc. 69 ¶ 28. Plaintiff sues Jeffrey Scott Marshall ("Marshall"), a former Public Defender who now works in private practice. *Id.* ¶ 29. Plaintiff names Hodge in Counts 18, 20, 26, 27, 31, 32, 33, and 34, and Marshall in Counts 18, 20, 27, 31, 32, and 33. Doc. 69. All of Plaintiff's claims against these two Defendants are asserted under § 1985 and/or § 1983.

Plaintiff alleges Hodge spoke to him "in a degrading, and combative manner." Doc. 69 ¶ 252. He alleges the case was already predetermined in Hodge's mind and that she avoided eye contact with him in the courtroom. *Id.* ¶¶ 255, 257. He alleges Hodge sent a younger public defender to represent him who ignored Plaintiff's cries for help. *Id.* ¶¶ 258, 259. According to Plaintiff, Hodge had no intention of obtaining evidence on behalf of Plaintiff to exonerate him. *Id.* ¶ 254. She purportedly sent him discovery responses from the prosecutor that contained perjured and changed responses. *Id.* ¶ 268. Plaintiff alleges that neither Hodge nor Marshall investigated the Messina statement, which he claims was a perjured document. *Id.* ¶ 273. Plaintiff indicates he complained to Hodge and Marshall about the emergency room bill he received from Tampa General Hospital, but they never replied to him or investigated his complaints, which Plaintiff urges is further evidence of the cover-up. *Id.* ¶¶ 295, 296. Plaintiff alleges that neither Hodge nor Marshall ever wrote to him when he was

in jail in Arlington, Virginia. *Id.* ¶ 416. He complains that the deposition of Defendant Guzina was not conducted properly, nor was it conducted by Hodge or Marshall. *Id.* ¶ 526.

Hodge and Marshall move to dismiss all claims against them, arguing they are entitled to qualified immunity. The Court notes that, generally, public defenders are not entitled to immunity. *Tower v. Glover*, 467 U.S. 914, 916 (1984) ("public defenders are not immune from liability in actions brought by a criminal defendant against state public defenders who are alleged to have conspired with state officials to deprive the § 1983 plaintiff of federal constitutional rights"). However, as discussed in section (B) above, Plaintiff fails to allege any ultimate fact as to racial or class-based animus to invoke liability under § 1985(3), under which most of the claims are asserted against Hodge and Marshall. Thus, Counts 18, 20, 26, 27, 31, 32, 33, and 34, to the extent they are brought under § 1985(3), are dismissed with prejudice.

Regarding Plaintiff's claims in Counts 31 and 33, which are brought also under § 1983, against Hodge and Marshall, the claims are similarly due to be dismissed with prejudice because public defenders are not "state actors" for purposes of § 1983 liability. *See Polk Cty. v. Dodson*, 454 U.S. 312, 325 (1981) (holding that a public defender does not act under color of state law, as required under § 1983, when he performs a lawyer's traditional function by acting as defense counsel in a criminal proceeding); *see also Rolle v. Glenn*, 712 F. App'x 897, 899 (11th Cir. 2017) (holding that district court properly determined, as to the public defenders, that they are not liable because they are not state actors for purposes of § 1983). Hodge's conduct of attending

24

hearings, sending and receiving emails with Plaintiff, investigating case facts, and communicating with Plaintiff about his case are traditional defense lawyer functions.

Plaintiff generally refers to Marshall as his attorney. Doc. 69 ¶¶ 295, 323, 335, 416. He alleges Marshall was copied on an email from Hodge, Marshall failed to investigate purportedly perjured discovery, Marshall fails to respond to Plaintiff's email about the Tampa General Hospital bill, Plaintiff emails Marshall "begging for a defense," Marshall never wrote or called Plaintiff when Plaintiff was incarcerated in Arlington Virginia, Marshall conspired to have Plaintiff's bond revoked so he ends up in jail, and Marshall fails to conduct the deposition of John Guzina. Plaintiff's allegations regarding Marshall arise out of Marshall's duties as a public defender.

In response to the motion to dismiss, Plaintiff argues that Hodge and Marshall failed to obtain all audio, video, bodycams and possible cell phone video or pictures. Doc. 79 at 12, n.14. Additionally, he complains these Defendants failed to obtain a Ticketmaster name seating chart for the surrounding area that could lead to potential witnesses. He contends Defendants ignored him and never responded to him and that they intentionally waited while video evidence was not preserved. Further, he claims Hodge shared his travel emails with Scott and Judge Ward. Plaintiff's allegations further demonstrate that Hodge and Marshall's acts and omissions arise out of their role as public defenders, and thus they are not state actors for purposes of § 1983 liability. All claims against Hodge and Marshall are due to be dismissed, with prejudice.

E.   **Defendant's (Ray Roa) Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. 75)**

Defendant, Ray Roa ("Roa"), is alleged to be the "editor and chief" of a local news publication, *Creative Loafing,* in Tampa. Doc. 69 ¶ 32. He is sued in Count 11 for obstruction of justice under 42 U.S.C. § 1983; Count 12 for conspiracy to interfere with civil rights under 42 U.S.C. § 1985(3), Count 28 for "retaliation from freedom of speech" under 42 U.S.C. § 1985(3), and Count 33 for "conspiracy to a false conviction." His name is referenced in Counts 10 and 16 (¶¶ 417–20, 422, 426–28, 430–33), but he is not named as a defendant in those counts. In general, Plaintiff alleges Roa published a false defamatory media report about Plaintiff. Doc. 69 ¶ 159. According to Plaintiff's allegations, the article posted March 5, 2019. *Id.* ¶ 169. Additionally, Plaintiff claims Roa colluded with the other Defendants to sway public interest against Plaintiff, interfere with his criminal case, spread false information about Plaintiff, defame Plaintiff's character, stalk Plaintiff on social media, and deprive Plaintiff of his civil rights. *Id.* ¶¶ 160–83.

Roa moves to dismiss the claims against him. Doc. 75. In support, Roa argues the Second Amended Complaint should be dismissed because it is a shotgun pleading, and Plaintiff's defamation claim fails because the two-year statute of limitations has expired, the statements are not false, and he fails to state a claim. Additionally, Roa argues Plaintiff's conspiracy allegations fail. Roa's motion (Doc. 75) is due to be granted. For the reasons stated above, the Second Amended Complaint is subject to dismissal as a shotgun pleading.

The gravamen of Plaintiff's claims against Roa are that Roa defamed Plaintiff by posting an article in *Creative Loafing* regarding Plaintiff that "affected the entire judicial process in establishing a bias and hatred towards the Plaintiff." Doc. 69 ¶ 169. Roa contends any defamation claim against him for that article is barred due to the running of the two-year statute of limitations. Because of the shotgun nature of Plaintiff's Second Amended Complaint, it is not entirely clear to the Court that Plaintiff is asserting a stand-alone state law claim for defamation against Plaintiff. But clearly all of Plaintiff's claims against Roa are founded on the purported defamation by Roa. As such, the Court will address the statute of limitations argument.

"At the motion-to-dismiss stage, a complaint may be dismissed on the basis of a statute-of-limitations defense only if it appears beyond a doubt that Plaintiffs can prove no set of facts that toll the statute." *Lindley v. City of Birmingham*, Ala., 515 F. App'x 813, 815 (11th Cir. 2013) (quoting *Tello v. Dean Witter Reynolds, Inc.*, 410 F.3d 1275, 1288 n.13 (11th Cir. 2005)). "The statute of limitations is an affirmative defense, and a plaintiff is not required to negate an affirmative defense in his complaint." *Tregenza v. Great Am. Commc'ns Co.*, 12 F.3d 717, 718 (7th Cir. 1993) (citing *Gomez v. Toledo*, 446 U.S. 635, 640 (1980)).

Defamation is defined as "the unprivileged publication of false statements which naturally and proximately result in injury to another." *Wolfson v. Kirk*, 273 So.2d 774, 776 (Fla. 4th DCA 1973) (citing *Cooper v. Miami Herald Pub. Co.*, 31 So.2d 382, 384 (Fla. 1947)). The elements of a cause of action for defamation are: (1) the defendant published a false statement, (2) about the plaintiff, (3) to a third party, and

27

(4) the falsity of the statement caused injury to the plaintiff. *Bass v. Rivera*, 826 So. 2d 534, 535 (Fla. 2d DCA 2002) (citing *Valencia v. Citibank Int'l*, 728 So.2d 330, 330 (Fla. 3d DCA 1999)).

Under Florida law, a claim for defamation must be filed within two years. *See* Fla. Stat. § 95.11(4)(g) (action for libel or slander must be commenced within two years).[6] "[T]he time within which an action shall be begun under any statute of limitations runs from the time the cause of action accrues." Fla. Stat. § 95.031. A cause of action for defamation accrues at the time of first publication. *Wagner, Nugent, Johnson, Roth, Romano, Erikson & Kupfer, P.A. v. Flanagan*, 629 So. 2d 113, 115 (Fla. 1993). According to the Second Amended Complaint, the alleged offending article was published March 5, 2019. Doc. 69 ¶ 169.

The Eleventh Circuit has explained:

> The general rule is "that a complaint is 'filed' for statute of limitations purposes when it is 'in the actual or constructive possession of the clerk.'" *Rodgers ex rel. Jones v. Bowen*, 790 F.2d 1550, 1552 (11th Cir. 1986) (quoting *Leggett v. Strickland*, 640 F.2d 774, 776 (5th Cir. Mar. 1981)); *see Houston v. Lack*, 487 U.S. 266, 273, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988) ("[R]eceipt constitutes filing in the ordinary civil case...."); Fed. R. Civ. P. 5(d) (stating that a paper is "filed" by delivering it to the clerk or a judge who agrees to accept it for filing). Mailing alone is not enough. *See Leggett*, 640 F.2d at 776 (holding that a complaint mailed before but received after the expiration of the limitations period was time-barred).

---

[6] "'Slander' is ordinarily confined to defamatory spoken words, whereas 'libel' pertains to defamatory written statements." *Tillett v. BJ's Wholesale Club, Inc.*, No. 3:09-CV-1095-J-34MCR, 2010 WL 11507322, at *2 (M.D. Fla. July 30, 2010) (quoting *Fortson v. Colangelo*, 434 F. Supp. 2d 1369, 1378 n.11 (S.D. Fla. 2006)). Putting aside "the particulars of the title, the elements of libel and slander—defamation—are the same." *Id.*

*Tucker v. United States*, 724 F. App'x 754, 757 (11th Cir. 2018). Here, Plaintiff mailed his Complaint on March 5, 2021, a Friday, with an expected delivery date of Saturday, March 6, 2021. *See* Doc. 1-2 (mailing envelope that accompanied Plaintiff's Complaint reflecting an expected delivery date of March 6, 2021). Because March 6, 2021 was a Saturday, the Clerk's Office was not open that day, and thus the Complaint was docketed on the next business day that the Court was open, which was Monday, March 8, 2021. *See* Doc. 1.

The two-year statute of limitations for defamation accrued on March 5, 2019, the date of publication. *See Wagner, Nugent, Johnson, et al.,* 629 So. 2d at 115. Two years from March 5, 2019 is March 5, 2021, notwithstanding that 2020 was a leap year. Calculating time in years is calculated by the "anniversary date" regardless of whether it's a leap year. *See United States v. Hurst*, 322 F.3d 1256, 1260 (10th Cir. 2003) (quoting *United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) ("Under this rule, when a statute of limitations is measured in years, the last day for instituting the action is the anniversary date of the relevant act. The anniversary date is the 'last day to file even when the intervening period includes the extra leap year day.'"); *see also Shepherd*, 663 F. App'x at 817 (holding statute of limitations expires on the anniversary of the date of the accrual of the claim, in whichever year is prescribed under the applicable statute of limitations). Calculations under Florida law are the same. *See Carter v. Cerezo*, 495 So. 2d 202, 203 (Fla. 5th DCA 1986) ("We can only conclude that in the context in which it is used, a "period of one year" . . . includes both regular and leap years.").

29

Thus, the last date for Plaintiff to file his Complaint and still be within the two-year statute of limitations was March 5, 2021. As noted above, mailing alone is insufficient.[7] *See Leggett*, 640 F.2d at 776. Although not docketed until March 8, 2021, the Complaint was likely in the actual or constructive possession of the Clerk on March 6, 2021—still one day late and after the statute of limitations expired.[8] While not accepting a complaint as timely when filed only one day late may seem unfair, courts must draw the line somewhere. *See United States v. Marcello*, 212 F.3d 1005, 1010 (7th Cir. 2000) (explaining that "foreclosing litigants from bringing their claim because they missed the filing deadline by one day may seem harsh, but courts have to draw lines somewhere, [and] statutes of limitation protect important social interests"). Thus, to the extent Plaintiff is asserting a state law claim for defamation against Roa based on the March 5, 2019 article, the defamation claim is time-barred.

Further, Plaintiff's claims against Roa under 42 U.S.C. § 1985 fail because Plaintiff does not allege a discriminatory animus based on race or class. Lastly, Plaintiff may not sue Roa, a private individual, under § 1983, which is reserved for

---

[7] While the Eleventh Circuit applies the "mailbox rule" to prisoner filings, there is no allegation that Plaintiff was incarcerated on March 5, 2021, when he mailed the complaint. *See Daniels v. United States*, 809 F.3d 588, 589 (11th Cir. 2015) (quoting *Williams v. McNeil*, 557 F.3d 1287, 1290 n. 2 (11th Cir. 2009) (recognizing the Eleventh Circuit applies the prison mailbox rule, under which "a pro se prisoner's court filing is deemed filed on the date it is delivered to prison authorities for mailing."). Thus, Plaintiff cannot avail himself of the mailbox rule to save his late filing.

[8] Roa's motion indicates the initial complaint was filed May 8, 2021. Doc. 75 at 9. This is incorrect. The initial complaint was filed on March (not May) 8, 2021. *See* Doc. 1. Regardless, the two-year statute of limitations ran on March 5, 2021, prior to the date the Clerk's Office had actual or constructive possession of the Complaint.

state actors. In Count 11, Plaintiff seeks to hold Roa liable for obstruction of justice under 42 U.S.C. § 1983. "[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful." *Focus on the Fam. v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1277 (11th Cir. 2003) (quoting *American Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 49–50 (1999) "[T]o hold that private parties. . . are State actors, this court must conclude that one of the following three conditions is met: (1) the State has coerced or at least significantly encouraged the action alleged to violate the Constitution ('State compulsion test'); (2) the private parties performed a public function that was traditionally the exclusive prerogative of the State ('public function test'); or (3) the State had so far insinuated itself into a position of interdependence with the [private parties] that it was a joint participant in the enterprise[] ('nexus/joint action test')." *Rayburn ex rel. Rayburn v. Hogue*, 241 F.3d 1341, 1347 (11th Cir. 2001) (citing *NBC, Inc. v. Communications Workers of America*, 860 F.2d 1022, 1026–27 (11th Cir. 1988)). While Plaintiff alleges in conclusory fashion that Roa was "acting under color of state law," Plaintiff asserts no factual allegations to demonstrate Roa is a state actor or that any one of these three conditions is satisfied in order to sue him as a state actor. Roa's motion to dismiss is due to be granted.

### F.    Defendant Tampa General Hospital's Motion to Dismiss (Doc. 78)

Plaintiff sues Defendant Tampa General Hospital ("TGH") in Count 5 for "facilitation to police misconduct" in violation of the Fourth Amendment, Count 19 for fraudulent billing practices under Florida's False Claims Act, and Count 33 for

"conspiracy to a false conviction." Additionally, Plaintiff includes allegations about TGH and its employees in Count 4 but does not sue TGH in Count 4. TGH moves to dismiss the claims against it because Plaintiff's Second Amended Complaint is a shotgun pleading, Plaintiff fails to allege state action on the part of TGH, and Plaintiff lacks standing to bring a False Claims Act violation claim. Doc. 78. Plaintiff responds in opposition arguing the motion should be denied because TGH conspired with law enforcement to deprive Plaintiff of his liberties and basic civil and human rights. Doc. 92. Plaintiff claims his cries for help to TGH staff regarding his false arrest and the "cover-up in progress" were ignored. He complains that TGH forcibly billed Plaintiff $1,904.00 for services not rendered.

As discussed above, Plaintiff's Second Amended Complaint is subject to dismissal as a shotgun pleading, and thus, TGH's motion is due to be granted. Additionally, Plaintiff's claims in Count 33 for "conspiracy to a false conviction" under § 1985(3) are due to be dismissed as Plaintiff alleges no race or class-based discriminatory animus.

Count 5 seeks to hold TGH liable under 42 U.S.C. § 1983 for purportedly "facilitating police misconduct." To state a cause of action under section 1983, a plaintiff must allege the conduct complained of "(1) was committed by a person acting under color of state law and (2) deprived the complainant of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Harvey v. Harvey*, 949 F.2d 1127, 1130 (11th Cir. 1992) (citing *Flagg Brothers, Inc. v. Brooks*, 436 U.S. 149, 156–57 (1978)).

Plaintiff alleges TGH and its employees had a duty to report federal crimes in progress. Plaintiff claims TGH violated this duty by allowing Tampa Police Department ("TPD") officers to stay with him in the emergency room and force Plaintiff to be Baker Acted, which was cruel and unusual punishment. Plaintiff alleges TGH and its employees participated and facilitated the police misconduct by allowing TPD to use TGH as an illegal holding facility. Doc. 69 ¶¶ 93–110.

Count 5 fails to state a claim against TGH. While Plaintiff alleges in conclusory fashion that TGH and its employees "acted under color of state law," Plaintiff fails to allege any ultimate facts to support his claim. Specifically, Plaintiff does not allege facts that establish TGH or its employees are state actors. And private hospitals cannot be held liable under § 1983 for the acts of its employees on a *respondeat superior* or vicarious liability theory. *Harvey v. Harvey*, 949 F.2d 1127, 1129 (11th Cir. 1992) (citing *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658 (1978)).

Plaintiff's claim in Count 19 for alleged fraudulent billing practices also fails. Plaintiff seeks to hold TGH liable under Florida's False Claims Act, § 68.083, Fla. Stat. As explained in TGH's motion to dismiss, a claim under Florida's False Claims Act must be brought in the name of the State of Florida. Doc. 78 at 7 (citing § 68.083(2), Fla. Stat. (providing that "[c]ivil actions instituted under this act shall be governed by the Florida Rules of Civil Procedure and shall be brought in the name of the State of Florida.")). The "sine qua non of a False Claims Act violation" is the submission of a false claim to the government. *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1045 (11th Cir. 2015) (citations omitted). Here, Plaintiff complains about a bill

for services he received. There are no allegations regarding false claims submitted to the state and nothing about Plaintiff's allegations remotely give rise to a False Claims Act claim. Count 19 is due to be dismissed for failing to state a claim.

### G.    Defendant Douglas Messina's Motion to Dismiss (Doc. 76)

Messina is alleged to be a security guard who works for Amalie Arena. Doc. 69 ¶ 25. Plaintiff sues Messina in Count 1 for "negligent and inadequate security premises liability." In Count 16, he sues Messina for malicious prosecution in violation of the Fourth Amendment. In Count 32, he sues Messina for conspiracy to suppress evidence, and in Count 33 he sues Messina along with all other Defendants for conspiracy to a false conviction. Messina moves to dismiss all claims against him because Plaintiff's Second Amended Complaint is a shotgun pleading, Plaintiff fails to state a claim for "negligent security premises liability" against this Defendant, and Messina is a private actor who may not be held liable under § 1983 based on Plaintiff's allegations. Plaintiff responds that Messina's motion "has no practical relevance" and that Messina conspired with law enforcement to deprive him of his most basic civil rights. Doc. 81. Plaintiff claims Messina had no contact with Plaintiff that night and that Messina was a "fabricated witness" that gave false testimony after the fact.

Messina's motion is due to be granted. First, the Second Amended Complaint is a shotgun pleading. Second, Plaintiff's claims in Counts 16, 32, and 33 are due to be dismissed because Plaintiff fails to allege facts, as opposed to conclusory statements, that Messina is a state actor, which is required to give rise to liability against him under

34

§ 1983 and Plaintiff fails to plead any allegation of race or class-based animus to state a claim under § 1985(3).

As for Plaintiff's claims in Count 1 for alleged negligent security, negligence, and premises liability, Plaintiff asserts multiple causes of action in one Count which further demonstrates that Plaintiff's Second Amended Complaint is a shotgun pleading and pleaded contrary to Federal Rules of Civil Procedure 8 and 10. Moreover, as pointed out by Messina's motion to dismiss, Plaintiff's allegations fail to state a claim against Messina as no premises liability and/or negligent security claim can be pursued against Messina in the absence of any allegation that Messina controlled the subject property. *See Brown v. Suncharm Ranch, Inc.*, 748 So.2d 1077, 1078 (Fla. 5th DCA 1999) ("The duty to protect others from injury resulting from a dangerous condition on a premises rests on the party who has the right to control access by third parties to the premises, be it the owner, an agent, or a lessee of the property."). Here, Plaintiff fails to allege that Messina controlled, owned, or leased Amalie Arena. Indeed, in his response, Plaintiff states that Messina did not engage with Plaintiff at all on the night of the incident. Count 1 fails to state a claim against Messina.

### H.   Defendants' Michael K. Campani, City of Tampa, John W. Guzina, Susan C. Harmison, David J. Hazelzet, Martha A. Murillo, and Robin S. Sarrasin's Motion to Dismiss (Doc. 77)

Plaintiff sues the City of Tampa and TPD police officers Campani, Hazelzet, Murillo, Harmison, and Sarrasin, along with Guzina, whom Plaintiff alleges is the head of the TPD crimes division, (collectively "TPD Defendants"). The TPD

Defendants move to dismiss all claims against them. Doc. 77. The Defendant officers are sued in both individual and official capacities. Because an official capacity claim under § 1983 is a claim against the entity, suing the officers on an official capacity theory is redundant to suing the entity—the City of Tampa—which Plaintiff has done. Regarding Plaintiff's § 1983 claims against the City, the City contends that Plaintiff fails to allege any municipal policy or custom that caused the alleged constitutional violations in order to impose § 1983 liability on it. The TPD Defendants also argue that *Heck v Humphrey* bars Plaintiff's constitutional claims against the City. The TPD Defendants submit the Second Amended Complaint is due to be dismissed as a shotgun pleading, and finally they argue that the Tampa Police Department, which is named in Counts 9, 17, 21, 22, and 28 but not specifically identified in the general allegations as a Defendant, cannot be sued in any event because the police department is not an entity subject to suit.

In opposition, Plaintiff submits that these Defendants are directly responsible for the claims asserted. Doc. 84. He argues the TPD Defendants colluded and conspired to frame him, and their motive was financial. He contends that Guzina, the head of the TPD crimes division, was called in to "clean up the mess of the officers who thru false hearsay assaulted the Plaintiff." *Id.* at 3. Plaintiff argues that after he posted Guzina's name all over Facebook that Guzina sent four officers to Plaintiff's residence to harass and intimidate him.

As an initial matter, the Second Amended Complaint is due to be dismissed as a shotgun pleading as discussed above. In response to Defendants' arguments that the

official capacity claims against the individual officers should be dismissed, Plaintiff argues "[i]t's not for anyone to play the cat and mouse game to guess if the Officers were in official capacity or not." Doc. 84 at 10. He suggests this is a legal trick to avoid liability. Plaintiff's response is unpersuasive, and the Court finds dismissal of the official capacity claims against the individual officers to be warranted as Plaintiff has sued the municipal entity. *See Busby v. City of Orlando*, 931 F.2d 764, 776 (11th Cir. 1991) ("Because suits against a municipal officer sued in his official capacity and direct suits against municipalities are functionally equivalent, there no longer exists a need to bring official-capacity actions against local government officials, because local government units can be sued directly.").

Regarding Plaintiff's § 1983 claims against the City, the TPD Defendants are correct that Plaintiff fails to properly plead the existence of a policy or custom which is required to impose § 1983 liability on the City. "Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). Plaintiff fails to allege facts regarding a policy or custom of the municipality that inflicts the injury on him and thus he fails to state a claim against the City under § 1983.

Regarding Defendants' motion that Tampa Police Department be dismissed, although Plaintiff includes "TPD" in the headings of some counts, it does not appear that he names TPD as a Defendant. Rather, he properly names the City of Tampa.

37

However, for clarity purposes, in the event Plaintiff chooses to amend, he is directed to remove the reference to TPD in the headings of his counts.[9]

### I.      Defendant Lightning Hockey, LP's Motion to Dismiss (Doc. 91)

In the Second Amended Complaint, Plaintiff alleges that the Lightning Hockey L.P. ("LH LP") lease the Amalie Arena in downtown Tampa and is responsible for the management of the Arena. Doc. 69 ¶ 34. Plaintiff sues LH LP in Counts 1, 4, 6, 22, 27, and 33. Defendant LH LP moves to dismiss all claims against it because Plaintiff's Second Amended Complaint is a shotgun pleading. Doc. 91. Additionally, LH LP states it is a Delaware limited partnership that has no ownership interest or ability to control the Amalie Arena. Rather, it is the entity involved in managing the Tampa Bay Lightning hockey team. Thus, it argues it has been improperly named as a Defendant in this lawsuit and has no connection to the subject matter of Plaintiff's claims. Like the other Defendants, LH LP argues it is not a state actor and Plaintiff fails to plead sufficient facts, as opposed to conclusory allegations, to show it was a state actor or that it violated Plaintiff's constitutional rights. In his response in opposition, Plaintiff claims LH LP does business in Florida, is responsible for the management of the Amalie Arena, and works directly with the Tampa Police Department. Doc. 93. He claims LH LP breached its duty to exercise care for the safety of the fans in attendance at the PINK concert. Specifically, he alleges that LH LP breached this duty by failing to hire adequate security. Plaintiff claims LH LP

---

[9] The Court addresses Defendants' *Heck v Humphrey* arguments in section (K) below.

38

conspired with Messina and Niles in framing, perjuring, and orchestrating a cover-up that led to Plaintiff's three felony convictions. Plaintiff argues LH LP partnered with TPD to engage in police misconduct that violated Plaintiff's constitutional rights.

Here, Plaintiff alleges LH LP managed the Amalie Arena and was responsible for its security on the night of the incident. LH LP flatly disputes that it has any role in the management of the facility and asserts it has been named improperly as a Defendant in this litigation. Such disputed facts are not typically resolved on a motion to dismiss. However, because the Second Amended Complaint is a shotgun pleading, LH LP's motion to dismiss (Doc. 91) is due to be granted. The Court is allowing Plaintiff one final opportunity to amend his complaint, and thus it is recommended Plaintiff determine if he has named the proper defendant before filing his amended pleading.

### J.    Daryl Niles' Re-Filed Motion to Dismiss (Doc. 102)

Daryl Niles is alleged to be a former police officer and former head of security at the Amalie Arena. Doc. 69 ¶ 24. Plaintiff sues Niles in Counts 1, 4, 6, 12, 16, and 33. Because the Second Amended Complaint is a shotgun pleading, it is due to be dismissed. Additionally, Counts 12 and 33, brought under § 1985(3), are dismissed with prejudice as set forth above.

Niles moves to dismiss all claims against him because Plaintiff failed to properly serve Niles within the time period or in the manner prescribed by Rule 4. Additionally, Niles argues the Second Amended Complaint should be dismissed as a shotgun pleading, fails to state a claim, because Niles is not a state actor, was not acting under

"color of state law," and because Plaintiff fails to allege facts that Niles violated a constitutional right. Doc. 102. Plaintiff responds in opposition stating that Niles managed operations and/or worked at the Amalie Arena on the night in question and was a conspirator in setting up the false charges brought against Plaintiff. Plaintiff argues that Niles was evading service, Niles' attorney purportedly had the proper complaint, and Plaintiff sent the complaint to Niles via USPS which Niles signed for. Niles' motion is due to be granted.

"[A] plaintiff bears the ultimate burden of proving valid service of process." *Friedman*, 777 F. App'x at 331. Here, Plaintiff fails to do so. Under Florida law, "strict compliance with service of process procedures is required." *Baraban v. Sussman*, 439 So.2d 1046, 1047 (Fla. 4th DCA 1983) (citing *Electro Eng'g Prods. Co. v. Lewis*, 352 So.2d 862 (Fla. 1977)). Plaintiff claims that Niles was evading service but fails to provide any affidavit from a process server attesting to same. While there are recognized exceptions to the statutory service requirements where a defendant attempts to evade service of process, *see Schupak v. Sutton Hill Associates*, 710 So. 2d 707, 709 (Fla. 4th DCA 1998), Plaintiff provides no affirmative evidence to establish Niles was actively evading service or that Plaintiff properly complied with Florida law regarding substituted service. As noted by the motion, Plaintiff alleges he mailed a copy of the Amended Complaint to Niles, but he has not shown that a summons was included or that the package was properly served under Rule 4. Doc. 102 at 3. Accordingly, service on Niles is due to be quashed. Additionally, as noted above, the Second Amended Complaint is dismissed as a shotgun pleading.

K.   *Heck v. Humphrey*

Several Defendants raise *Heck v. Humphrey* as a basis for dismissing Plaintiff's Second Amended Complaint. *See* Docs. 73, 74, 77. The *Heck* doctrine precludes any civil action by a prisoner alleging a deprivation of constitutional rights in obtaining a criminal conviction if a successful conclusion to the civil action implies the invalidity of the conviction. *Heck v. Humphrey*, 512 U.S. 477, 486–87 (1994) ("in order to recover damages for allegedly unconstitutional conviction or imprisonment . . . a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254"). Although *Heck* involved § 1983 claims, other jurisdictions have concluded that *Heck* applies equally to § 1985 claims if the claim attacks the validity of the conviction. *See e.g. Lanier v. Bryant*, 332 F.3d 999, 1005–06 (6th Cir. 2003) (holding *Heck* applies equally to claims brought under §§ 1983, 1985 and 1986); *Lawson v. Engleman*, 67 F. App'x 524, 526 n.1 (10th Cir. 2003) (applying *Heck* to § 1985 action); *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999) (applying *Heck* to § 1985 action).

The Eleventh Circuit has not squarely decided whether *Heck* applies to bar a plaintiff's § 1983 claim that attacks an underlying conviction where the plaintiff is no longer incarcerated as is the case here.

> "A circuit split has developed regarding the application of *Heck* to situations where a claimant, who may no longer bring

41

a habeas action, asserts a § 1983 complaint attacking a sentence or conviction." *Domotor v. Wennet*, 630 F.Supp.2d 1368, 1376–77 (S.D. Fla. 2009) (collecting cases). This circuit has not definitively answered the question. *See Abusaid v. Hillsborough Cty. Bd. of Cty. Com'rs*, 405 F.3d 1298, 1316 n.9 (11th Cir. 2005) (discussing "the [open] question of whether *Heck* bars § 1983 suits by plaintiffs who are not in custody," and noting "[o]ur court has not yet weighed in on this issue"). There are cases from this circuit that have suggested that *Heck* never applies to such a suit, *see Harden v. Pataki*, 320 F.3d 1289, 1298 (11th Cir. 2003), while others suggest *Heck* would almost always apply, *see Vickers v. Donahue*, 137 F. App'x 285, 289–90 (11th Cir. 2005) (per curiam) (unpublished). Still other cases have suggested a middle ground—that application of *Heck* turns on whether the plaintiff had a meaningful opportunity to file for habeas relief while incarcerated. *See Morrow v. Fed. Bureau of Prisons*, 610 F.3d 1271, 1272 (11th Cir. 2010) ("This case is one in which the alleged length of unlawful imprisonment—10 days—is obviously a duration that a petition for habeas relief could not have been filed and granted while Plaintiff was unlawfully in custody."); *see also id*. at 1273–74 (Anderson, J., concurring). However, we need not, and do not, answer the merits of the *Heck* question now.

*Topa v. Melendez*, 739 F. App'x 516, 519 n.2 (11th Cir. 2018).

In Counts 10 and 31, Plaintiff sues Defendants for false arrest and imprisonment and conspiracy to false arrest and imprisonment. These claims would certainly be the types of claims precluded by *Heck v. Humphrey* because successful conclusion of the claims implies the invalidity of the state court criminal conviction. *See Vickers v. Donahue*, 137 F. App'x 285, 286 (11th Cir. 2005) (affirming district court's finding that plaintiff's section 1983 claim alleging malicious and false arrest would necessarily invalidate a conviction that had not been reversed or declared invalid and, therefore, barred under *Heck*). For the Court here to find in Plaintiff's favor on his claim for false

arrest or imprisonment, it would necessarily require this Court to invalidate the state court criminal conviction, which has not been reversed or declared invalid, nor has Plaintiff alleged that his convictions were reversed or declared invalid. Similarly, Plaintiff's claims of conspiracy to suppress evidence and conspiracy to a false conviction in Counts 32 and 33, respectively, are the type of claims that would be barred by *Heck*. *See Abella v. Rubino*, 63 F.3d 1063, 1065 (11th Cir. 1995) (affirming dismissal of plaintiff's section 1983 claim that defendants conspired to convict him as barred under *Heck* because plaintiff's claims rest on the contention that the defendants unconstitutionally conspired to convict him of crimes he did not commit, and therefore, judgment in favor of plaintiff on these claims "would necessarily imply the invalidity of his conviction") (citations omitted); *Amaker v. Weiner*, 179 F.3d 48, 52 (2d Cir. 1999) (applying *Heck* to the § 1985 claims because "deciding in [the plaintiff's] favor on any of [the claims] plainly would call into question the validity of his conviction").

Given that Plaintiff's Second Amended Complaint is due to be dismissed in its entirety as a shotgun pleading and because other reasons support dismissal of Plaintiff's claims, the Court need not reach the question of whether *Heck* acts as a bar to some of Plaintiff's claims. It is worth noting, however, that Plaintiff had the opportunity to appeal his convictions, and according to his allegations, he did appeal his convictions, and all appeals were denied. Doc. 69 ¶ 530.

## IV.   CONCLUSION

Plaintiff's Second Amended Complaint is a rambling, disjointed and illogical shotgun pleading. As set forth above, several of the Defendants are immune from suit and many of the claims are due to be dismissed with prejudice. Service of process is defective on two Defendants.

Defendants' motions will be granted, and the Second Amended Complaint will be dismissed. It is not clear to the Court that Plaintiff can state any federal claim. However, the Court will allow Plaintiff one final opportunity to amend his complaint.[10] In so doing, Plaintiff should be mindful of Rule 8's dictate that a claim for relief contains "a short and plain statement showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Plaintiff is also reminded that any Defendant not properly served must be served with the Third Amended Complaint pursuant to the requirements of Rule 4, Fed. R. Civ. P. Accordingly, it is

**ORDERED**:

1.      Defendant Chad Chronister's Motion to Dismiss (Doc. 73) is **GRANTED**.

2.      Defendants Ashley Hodge, Jeffrey S. Marshall, Monique M. Scott, and Laura E. Ward's Motion to Dismiss (Doc. 74) is **GRANTED**.

3.      Defendant Ray Roa's Motion to Dismiss (Doc. 75) is **GRANTED**.

---

[10] Plaintiff is advised that an amended complaint supersedes the original in its entirety. Therefore, reference to a prior pleading or another document is improper–once Plaintiff files a Third Amended Complaint, the original pleading or pleadings will no longer serve any function in this case. Therefore, in an amended complaint, as in an original complaint, each claim and the involvement of each defendant must be sufficiently alleged.

4.      Defendant Douglas Messina's Motion to Dismiss (Doc. 76) is **GRANTED**.

5.      Defendants Michael K. Campani, City of Tampa, John W. Guzina, Susan C. Harmison, David J. Hazelzet, Martha A. Murillo, and Robin S. Sarrasin's Motion to Dismiss (Doc. 77) is **GRANTED**.

6.      Defendant Tampa General Hospital's Motion to Dismiss (Doc. 78) is **GRANTED**.

7.      Defendant Lightning Hockey, LP's Motion to Dismiss (Doc. 91) is **GRANTED**.

8.      Defendant Daryl Niles' Re-Filed Motion to Dismiss (Doc. 102) is **GRANTED**.

9.      Plaintiff's Second Amended Complaint (Doc. 69) is **DISMISSED** as a shotgun pleading.

10.     Counts 8, 9, 12, 13, 15, 18, 20, 23–29, 31–34, brought pursuant to 42 U.S.C. § 1985(3), are **DISMISSED with prejudice**.

11.     All claims against Judge Laura Ward are **DISMISSED with prejudice** based on judicial immunity.

12.     All claims against Defendant Monique M. Scott are **DISMISSED with prejudice** based on prosecutorial immunity.

13.     All claims against Ashley Hodge are **DISMISSED with prejudice**.

14.     All claims against Jeffrey Marshall are **DISMISSED with prejudice**.

15.    All defamation claims against Ray Roa based on the March 5, 2019 article are **DISMISSED with prejudice** as time-barred.

16.    Service of process on Chad Chronister and Daryl Niles is **QUASHED**.

17.    Plaintiff is granted one final opportunity to amend his complaint. If he chooses to amend, Plaintiff shall file his Third Amended Complaint by February 2, 2022. The Third Amended Complaint shall not include any claims or Defendants that have been dismissed with prejudice. If Plaintiff includes in the Third Amended Complaint any claim or Defendant that has been dismissed with prejudice, such count will be stricken without further notice. Failure to file a Third Amended Complaint within the time permitted will result in dismissal of this action without prejudice and without further notice.

**DONE AND ORDERED** in Tampa, Florida on January 12, 2022.

*Charlene Edwards Honeywell*

Charlene Edwards Honeywell
United States District Judge

Copies to:
Counsel of Record
Unrepresented Parties

46